## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DEUTSCHE BANK NATIONAL TRUST | : | |
| COMPANY, solely as Trustee for Morgan | : | |
| Stanley ABS Capital I Inc. Trust 2006- | : | |
| WMC2 | : | CIVIL ACTION NO: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WMC MORTGAGE, LLC, GENERAL | : | |
| ELECTRIC CAPITAL CORPORATION | : | JUNE 25, 2012 |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

### COMPLAINT

Plaintiff Deutsche Bank National Trust Company (the "Trustee" or "DBNTC"), solely in

its capacity as trustee for Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2 (the "Trust"),

for its Complaint against WMC Mortgage, LLC ("WMC") and General Electric Capital

Corporation ("GE Capital" and together with WMC, "Defendants") alleges upon information and

belief as follows:

### SUMMARY OF CLAIMS

1.        This action arises out of Defendants' failure to honor their contractual mortgage

repurchase and indemnification obligations to the Trust.

2.        The Trust was formed as part of a $2.6 billion residential mortgage securitization

sponsored by Morgan Stanley Mortgage Capital Inc. and its affiliated entities.  At the time of

securitization, all rights, title and interest to a pool of mortgage loans with an unpaid principal

balance of more than $2.6 billion was conveyed to the Trust.  The pool of mortgage loans was

originally owned by WMC and, in connection with the acquisition of the loans, WMC made

numerous representations and warranties relating to their nature and quality.  Independent of its

representations and warranties, WMC also took upon itself certain repurchase and

indemnification obligations, which Defendants now refuse to fulfill and which form the basis for

this Complaint.

3.      In connection with the mortgage securitization, WMC agreed to act as the

"Responsible Party" and in that role entered into a Pooling and Servicing Agreement dated as of

June 1, 2006 (together with its schedules, exhibits and amendments, the "PSA").  As Responsible

Party, WMC made 68 specific representations and warranties about the nature and quality of the

mortgage loans in the Trust.  These representations and warranties relate to, among other things,

the ability of the borrower to make his or her monthly mortgage payment and the security of the

collateral supporting the loan.

4.      As Responsible Party, WMC also took upon itself the independent obligation to

repurchase from the Trust, within 60 days of the earlier of either discovery by or notice to WMC,

any mortgage loan in breach of a representation or warranty that "materially and adversely

affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders

therein."  PSA § 2.03(f).  For many of the 68 representations and warranties set forth in the PSA,

WMC agreed in advance that any breach of those representations and warranties would "be

deemed automatically to materially and adversely affect the value of such Mortgage Loan and

the interests of the Trustee and Certificateholders in such Mortgage Loan."  Id.

5.      In addition to undertaking its repurchase obligation, WMC also agreed to

indemnify, among others, the Trustee and Trust for any losses, legal fees, costs or expenses

"resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting

from, a breach by the Responsible Party of any of its representations and warranties or obligations as Responsible Party contained in this Agreement."  PSA § 2.03(l).

6.      At the direction of an investor in the Trust, in January 2012, the Trustee commissioned a review into whether certain mortgage loans owned by the Trust breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."  PSA § 2.03(f).  The investor-directed review was conducted in two steps.

7.      First, an independent expert statistician was retained to randomly select a statistically representative sample from a pool of 5,342 non-performing loans with an original principal balance of over $1.2 billion.  The statistically representative sample of over 400 loans was then re-underwritten and reviewed on a loan-by-loan basis.  Over 99.7 percent of the sampled mortgage loans – and as a statistical matter over 99.7 percent of the population of 5,342 non-performing loans – breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."  Id.

8.      Second, a group of 1,000 additional mortgage loans from the same pool of 5,342 non-performing loans was selected.  The 1,000 mortgage loans, with an original principal balance of over $400 million, were then re-underwritten and reviewed on a loan-by-loan basis. The breach rate on this group of loans was in excess of 99.7 percent, which is consistent with the breach rate observed in the statistically representative sample.

9.      Promptly after the investor-directed loan review was concluded, the Trustee, based on that review, gave WMC written notice that over 99.7 percent of the sampled mortgage loans – and as a statistical matter over 99.7 percent of the population of 5,342 non-performing

loans – breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."  Id.  The Trustee provided WMC with detailed loan-by-loan and breach-by-breach descriptions along with thousands of pages of supporting documentation. Pursuant to Section 2.03 of the PSA, the Trustee demanded that:  (i) WMC repurchase the breaching loans; and (ii) indemnify the Trustee for its costs and expenses as provided for in Section 2.03(l) of the PSA.

10.      Consistent with Defendants' stated policy of "refut[ing] every loan" for which repurchase is demanded, Defendants have refused to honor their repurchase and indemnification obligations and have even refused to acknowledge that the detailed breach notices and thousands of pages of information that the Trustee provided to WMC triggered Defendants' repurchase obligation under Section 2.03 of the PSA.

11.      As a result of WMC's breach of its representations and warranties, as well as Defendants' breach of their independent contractual obligations to repurchase and indemnify the Trustee and Trust, the Trust has been injured in an amount that exceeds $650 million.

## PARTIES

12.      DBNTC is a national banking association organized under the laws of the United States of America to carry on the business of a limited purpose trust company.  DBNTC's main office is located at 2000 Avenue of the Stars, 9th Floor, North Tower, Los Angeles, California 90067 and its trust administration offices are located at 1761 East St. Andrew Place, Santa Ana, California 97025.  DBNTC brings this action solely in its capacity as Trustee of the Trust, and not in its individual capacity.

13.     Pursuant to Section 2.01(a) of the PSA, the Trustee holds "all the right, title and interest of the Depositor in and to the Trust Fund" for the benefit of the certificateholders and as such has standing and authority to sue on the Trust's behalf.

14.     The Trustee commences this lawsuit upon the written direction of certain certificateholders pursuant to Article VIII of the PSA and any conditions precedent to filing suit have been satisfied or deemed futile.

15.     Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2, or the Trust, was formed as of June 28, 2006, pursuant to the PSA.  The Trust is a New York common law trust created by written instruments manifesting the express intention to create a trust and setting forth the subject, purpose and beneficiaries of the Trust.  The Trustee brings this action pursuant to Federal Rule of Civil Procedure 17(a)(1)(E) as trustee of an express trust for the benefit of the Trust and the investors in the Trust.

16.     WMC is a limited liability company organized under the laws of the State of Delaware, with offices in Woodland Hills, California.  WMC's business is directed, controlled and coordinated from the offices of its sole member, GE Capital, a Delaware corporation whose principal place of business is Norwalk, Connecticut.

17.     WMC is the successor entity to WMC Mortgage Corp., which originated residential home mortgage loans.  WMC Mortgage Corp. was licensed by the Connecticut Department of Banking as a Mortgage Lender/Broker and was registered with the Connecticut Secretary of State as a foreign corporation doing business in Connecticut.

18.     Defendant GE Capital is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship existing between the parties and because the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside within this judicial district and because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

### I.     Securitization of Mortgage Loans

21.     Securitization is a common financing tool used to pool and convert assets such as residential mortgages into financial instruments that can be sold in the capital markets. Mortgages on residential real estate are commonly securitized because the borrower has an obligation to make regular, usually monthly, payments, which offer investors a consistent and predictable cash flow.

22.     Generally speaking, the entity that makes residential mortgage loans to homeowners is called the "originator" of the loans.  The process by which the originator decides whether to make a particular loan is known as the "underwriting" of the loan.  The general purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them, and that the loans are made only against sufficient collateral.  In the loan underwriting process, the originator applies underwriting guidelines to assess the creditworthiness of the borrowers and the sufficiency of the collateral, i.e., the value of the home.

23.     The securitization process begins with the pooling of a large number of loans, usually of a similar type, into a collateral pool.  The originator of the loans sells a pool of loans

(directly or indirectly) to a special-purpose entity known as a "depositor," which in turn sells the mortgage loans to a trust. Generally speaking, the loans are directly or indirectly purchased from the originator using funds raised by the selling of residential mortgage backed securities ("RMBS") or certificates to investors.

24.     By purchasing RMBS, or certificates, investors acquire the right to receive monies from the cash flows of the underlying mortgage loans or their proceeds (such as loan principal and interest or the proceeds from the liquidation of loan collateral). These cash flows are paid to RMBS investors pursuant to a contractually specified distribution plan and schedule.

25.     For an investor, the credit quality of the underlying mortgage loans, the amount of collateral securing the loans and the enforceability of the underlying mortgage loans are of paramount importance when choosing to invest in RMBS. These factors, as well as others, directly affect the cash flow generated by the underlying loans and therefore the value of the RMBS. Information about the credit quality of the underlying mortgage loans, the amount of collateral securing the loans and the enforceability of the underlying mortgage loans is usually contained in a file that the originator develops while underwriting and issuing the mortgage loan.

26.     For residential mortgage loans, the loan file typically contains documents such as the borrower loan application, credit reports, and property appraisals. The loan file should also include notes from the loan underwriter about the loan's compliance with the originator's underwriting standards.

27.     Because loan files are voluminous and contain legally protected confidential material, investors are generally not able to review the loan files before deciding whether to invest in RMBS. Instead, investors rely upon representations and warranties made by the originator or other "responsible party" about the contents of the loan file, the loans' credit quality

and the loan's collateral or security.  These representations are made by the originator or another

"responsible party" to the trustee and other parties for the benefit of the trust and purchasers of

the RMBS.

28.     These representations and warranties are important to investors, as is the

originator or "responsible party's" independent contractual obligation to repurchase any

mortgage loans that breach the representations and warranties in a manner that materially and

adversely affects the value of the mortgage loans or the investors' interests therein.  The security

provided by these representations and obligations is central to a certificateholder's decision to

invest in RMBS.

## II.     The Purchase and Servicing Agreement

29.     The Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2 securitization

("MSAC Securitization") was arranged and sponsored by Morgan Stanley Mortgage Capital Inc.

The mortgage loans included in the Trust were primarily fixed and adjustable rate subprime

mortgage loans secured by first-lien and second-lien mortgages or deeds of trust on residential

properties.  All of the mortgage loans in the MSAC Securitization were purchased from WMC.

30.     The MSAC Securitization was effectuated by Morgan Stanley ABS Capital I Inc.

(the "Depositor") purchasing, through its parent company, a pool of mortgage loans from WMC

(the "Trust Fund").  The Depositor then conveyed "without recourse, all the right, title and

interest of the Depositor in and to the Trust Fund" to the Trustee for the benefit of the

certificateholders.  PSA § 2.01(a).  The transaction was conducted pursuant to the PSA, which

sets forth the obligations of the various parties.

31.     The PSA for the Trust is dated June 1, 2006, and was entered into among the

Trustee, Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, N.A. ("Wells

Fargo"), as Servicer, Master Servicer, Securities Administrator and Custodian, and WMC, as Responsible Party. A copy of the PSA is attached hereto as Exhibit A, and incorporated herein by reference. Schedule I of the PSA contained a Mortgage Loan Schedule identifying the mortgage loans in the Trust (the "Mortgage Loans") as well as pertinent identifying characteristics of the Mortgage Loans.

> A.      WMC's Representations and Warranties

32.      Section 2.03(b), and Schedules III and IV of the PSA set forth a series of representations and warranties that WMC, as Responsible Party, made to the Trustee and others (the "WMC Representations and Warranties"). Schedule III of the original PSA includes 67 specific representations and warranties concerning the nature, characteristics, history and quality of the Mortgage Loans and the loan files (the "Mortgage Loan Files") sold to the Trust. Amendment No. 1 to the PSA, dated November 7, 2006, amends Schedule III to add one additional representation and warranty. The WMC Representations and Warranties, including the one contained in Amendment No. 1, were all made as of June 28, 2006.

33.      The WMC Representations and Warranties are too numerous to set forth in their entirety here, but are included in Schedule III of the PSA (Exhibit A) and incorporated herein by reference. Set forth below, verbatim from the PSA, are examples of the more commonly breached WMC Representations and Warranties:

> **Schedule III (64)**: <u>Underwriting Methodology</u>. The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the related Mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the related Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan. This representation and warranty is a Deemed Material and Adverse Representation.

9

**Schedule III (57)**:  <u>Origination</u>.  No predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor, were employed in the origination of the Mortgage Loan.

**Schedule III (11)**:  <u>Validity of Mortgage Documents</u>.  The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to prepayment penalties), subject to bankruptcy, equitable principles and laws affecting creditor rights. All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties.  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller in connection with the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan.  Notwithstanding the foregoing, but without limiting the other representations and warranties set forth elsewhere in this Agreement, if any error, omission or negligence in the origination of such Mortgage Loan occurred despite Seller's conformance with its Underwriting Guidelines (as in effect at the time such Mortgage Loan was made), then there shall be a presumptive conclusion that there was no error, omission or negligence.  No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of any Person (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan.  The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

**Schedule III (17)**:  <u>No Defaults</u>.  As of the related Servicing Transfer Date, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration, and neither the Seller nor any of its affiliates nor any of their respective predecessors, have waived any default, breach, violation or event which would permit acceleration.

**Schedule III (22)**:  <u>Conformance with Agency and Underwriting Guidelines</u>.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller (a copy of which is attached to each related Assignment and Conveyance Agreement). The Mortgage Note and Mortgage are on forms acceptable to prudent mortgage lenders in the secondary mortgage market and

10

no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used.

34.     The PSA also provides that for many of the 68 WMC Representations and Warranties in Schedule III, a breach "will be deemed automatically to materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificateholders in such Mortgage Loan" (the "Deemed Material and Adverse Representations").  PSA §2.03(f); Schedule III.

> B.     The Parties' Notice Obligations

35.     Although all ownership rights and interest in the Mortgage Loans were conveyed to the Trustee for the benefit of the Trust's certificateholders as of June 28, 2006, pursuant to Section 2.02 of the PSA, the mortgage loans and loan files, including the origination files, were to be maintained by Wells Fargo, as Custodian, on behalf of the Trustee and the Trust.

36.     Given this arrangement, the PSA imposes a continuing and independent duty upon all parties, including WMC, Wells Fargo, the Depositor and the Trustee, to provide notice of breaches of the WMC Representations and Warranties to the other parties (the "Notice Obligation").

37.     Specifically, Section 2.03(e) of the PSA provides that "[u]pon discovery by any of the Responsible Party, the Depositor, the Trustee or the Servicer of a breach of any of the foregoing representations and warranties that materially and adversely affect the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the party discovering such breach shall give prompt written notice to the other parties."

> C.     WMC's Repurchase Obligation

38.     As Responsible Party, WMC assumed the continuing and independent obligation to either cure or repurchase any Mortgage Loan that is in breach of a representation or warranty

that "materially and adversely affects the value of any Mortgage Loan or the interest of the

Trustee or the Certificateholders therein" (the "Repurchase Obligation").  PSA § 2.03(f).

      39.     Specifically, Section 2.03(f) of the PSA states, in pertinent part, as follows:

> … within 60 days of the earlier of either discovery by or notice to the Responsible
> Party of any breach of a representation or warranty, set forth in Section 2.03(b),
> that materially and adversely affects the value of any Mortgage Loan or the
> interest of the Trustee or the Certificateholders therein, the Responsible Party
> shall use commercially reasonable efforts to cause to be remedied a material
> defect in a document constituting part of a Mortgage File or promptly to cure such
> breach in all material respects and, if such defect or breach cannot be remedied,
> the Responsible Party shall … repurchase such Mortgage Loan at the Repurchase
> Price….  Notwithstanding the foregoing, a breach (i) which causes a Mortgage
> Loan not to constitute a "qualified mortgage" within the meaning of Section
> 860G(a)(3) of the Code or (ii) by the Responsible Party of any of the
> representations and warranties set forth in clause (43), (44), (46), (48), (50), (52),
> (53), (54), (55), (56), (57), (58), (59) or (69) of Schedule III, in each case, will be
> deemed automatically to materially and adversely affect the value of such
> Mortgage Loan and the interests of the Trustee and Certificateholders in such
> Mortgage Loan.

Section 2.03(f) of the PSA is set forth in its entirety on pp. 76-77 of the PSA (Exhibit A).

      40.     WMC's Repurchase Obligation requires WMC to "repurchase such Mortgage

Loan at the Repurchase Price."  PSA § 2.03(f).  As defined by the PSA, this means that WMC is

obligated to purchase from the Trust any breaching Mortgage Loan, including any liquidation,

insurance or REO proceeds of a breaching loan, for an:

> amount equal to the sum of (i) the unpaid principal balance of such Mortgage
> Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of
> such Mortgage Loan at the Mortgage Rate from the last date through which
> interest has been paid and distributed to the Securities Administrator to the date of
> repurchase, (iii) all unreimbursed Servicing Advances and (iv) all costs and
> expenses incurred by the Trustee arising out of or based upon such breach,
> including without limitation, costs and expenses relating to the Trustee's
> enforcement of the Responsible Party's repurchase obligation hereunder.

Exhibit A at p. 49.

41.     WMC's Repurchase Obligation is a valuable and important right because many of the mortgage loans sold to, and deposited in, the Trust are subprime and were made to borrowers who represent higher credit risks than traditional borrowers.  Thus, seemingly small differences in a borrower's qualifications, the terms of the mortgage loan, the quality and value of mortgage loan collateral, or the integrity of the mortgage loan origination process could materially and adversely affect the value of the Mortgage Loans or the interests of the Trustee or certificateholders therein.

D.     WMC's Indemnification Obligation

42.     Independent of its Repurchase Obligation, WMC is obligated to indemnify the Trustee and Trust for any losses or expenses incurred in, among other things, enforcing the rights of the Trust against WMC (the "Indemnification Obligations").

43.     Specifically, Section 2.03(l) of the PSA states, in pertinent part, as follows:

In addition to such repurchase or substitution obligation, the Responsible Party shall indemnify the Depositor and its Affiliates, the Servicer, the Sponsor, the Securities Administrator, the Trustee, the Custodian and the Trust and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach by the Responsible Party of any of its representations and warranties or obligations as Responsible Party contained in this Agreement.

III.     **WMC Breached the WMC Representations and Warranties**

A.     The Review of the Mortgage Loans

44.     In October 2011, an investor, pursuant to Section 8.02(d) of the PSA, directed the Trustee to commission an assessment of whether certain mortgage loans in the Trust breached the WMC Representations and Warranties.  Specifically, the Trustee was instructed to

commission a review of 5,342 non-performing mortgage loans identified by the instructing certificateholder (the "Non-Performing Loans").

45.     The Trustee promptly requested that Wells Fargo, as Servicer, provide the Trustee with the Mortgage Loan Files for the Non-Performing Loans.  The Trustee received access to the loan files in late January 2012, and, pursuant to the investor's direction, promptly caused a detailed review of the Non-Performing Loans (the "Loan Review") to be conducted.

### 1.     Sampling and Review of the Non-Performing Loans

46.     In connection with the Loan Review, the Trustee retained an expert to independently and randomly select a statistically representative sample of the Non-Performing Loans to review for possible breaches of the WMC Representations and Warranties.  The sample was generated using a methodology that is generally accepted in the scientific community such that the breach rate derived from an examination of the sample is accurate with respect to the entire population of Non-Performing Loans within a statistically significant 95 percent confidence range.

47.     The sample was selected using a methodology known as "random sampling with replacement."  Under this methodology, after a loan is randomly selected from the population of Non-Performing Loans it is returned to the population and then a second loan is selected at random.  This methodology keeps the selection pool constant and results in a more accurate sample.

48.     To ensure that the sample included at least 400 unique loans, 420 selections were taken from the population of Non-Performing Loans, including the loans randomly chosen more than once.  In total, 402 unique Mortgage Loans were included in the statistically representative sample (the "Sample Loans").

49.     The Loan Review entailed a detailed forensic re-underwriting of each Sample Loan.  This re-underwriting was completed by a team of skilled underwriters who completed a rigorous training program in re-underwriting the relevant vintage of loan production (the "Level 1 Review").  The relevant underwriting guidelines were furnished to all parties reviewing the files, and the complete loan files, each approximately 600 pages long on average, were reviewed and analyzed.

50.     After the initial Level 1 Review was completed, each breach finding was subject to a quality control review (the "Level 2 Review").

51.     Following the Level 2 Review, all the findings were reviewed by an independent expert with over thirty years of mortgage banking and underwriting experience (the "Level 3 Review").

52.     The review of the Sample Loans identified in 401 of the 402 unique Sample Loans breaches of the WMC Representations and Warranties that materially and adversely affect the value of the Sample Loans or the interest of the Trustee or certificateholders therein – a statistically representative breach rate of over 99.7 percent.  The review also showed that the Sample Loans breached multiple WMC Representations and Warranties.  On average there were more than five breaches of the WMC Representations and Warranties per breaching Sample Loan.

### 2.     The Additional Loan Reviews

53.     The statistical sampling used to select the Sample Loans is an appropriate methodology by which a statistically representative breach rate can be identified and repurchases demanded pursuant to the PSA, but Defendants have generally taken the position that statistical sampling of loans does not provide a valid basis upon which to assert a repurchase demand.

54.     Out of an abundance of caution and without prejudice to the population-wide repurchase demands based on the Sample Loans, additional loan reviews were performed on a 1,000-loan subset of the 5,342 Non-Performing Loans (the "Additional Loans").  This set of 1,000 Additional Loans did not include any of the Sample Loans.

55.     The review of the Additional Loans was conducted using the same re-underwriting and quality control process described in paragraphs 49 to 51, above.

56.     Of the 1,000 mortgage loans that were reviewed in connection with the Additional Loans, 994 mortgage loans breach the WMC Representations and Warranties in a manner that materially and adversely affects the value of the Mortgage Loans or the interest of the Trustee or the certificateholders therein.  These results are consistent with the breach rate of the Sample Loans.

### 3.     Types of Breaches

57.     The review of the Sample Loans and Additional Loans (collectively, the "Reviewed Loans") revealed that the vast majority of the Non-Performing Loans – indeed, nearly all – breached the WMC Representations and Warranties in a manner that materially and adversely affects the value of the Mortgage Loans or the interest of the Trustee or the certificateholders therein.

58.     The breaches discovered through the Loan Review include breaches of numerous WMC Representations and Warranties in a variety of different manners.  Attached hereto as Exhibit B, and incorporated herein by reference, is a detailed loan-by-loan and breach-by-breach review of the Sample Loans and Additional Loans.

59.     Some of the more commonly-observed breaches include:

a.      Mortgage Loan Schedule Discrepancy.  The Mortgage Loan Schedule

("MLS") is prepared by the originator and contains information about the mortgage loans

that are contained in a securitization.  For investors, it is the best – and often only –

source of information about the pool of mortgage loans, and includes data such as the

loan amount, documentation type and occupancy status, among other things.  Over 90

percent of the Reviewed Loans were materially misstated by WMC on the MLS, thereby

misleading investors about the quality and content of the mortgage loans in which they

were investing.  These misstatements breach the WMC Representations and Warranties

in Schedule III (1) and (11) of the PSA.

b.      Excessive DTI.  The Underwriting Guidelines place a limit on the amount

of debt a borrower may have relative to his or her income. This ratio is usually a material

consideration for lenders because it directly relates to the borrower's expected ability to

repay the mortgage loan.  For over 54 percent of the Reviewed Loans, this ratio, called

the Debt-to-Income ratio (or "DTI"), exceeded the limits provided for in the

Underwriting Guidelines.  Such DTI ratios breach the WMC Representations and

Warranties in Schedule III (22), (35), (64), (11) and (57) of the PSA.

c.      Misrepresentation of Income.  In over 29 percent of the Reviewed Loans,

the borrower misrepresented his or her income in the loan application.  This misstatement

breaches the WMC Representations and Warranties in Schedule III (22), (35), (64), (17),

(11) and/or (57) of the PSA.

d.      Misrepresentation of Debt Obligations.  The Underwriting Guidelines

required the borrower to disclose all debt obligations on the mortgage application,

including, for example, other mortgages and pending transactions that would result in new debt.  In over 18 percent of the Reviewed Loans borrowers failed to disclose existing or pending debt obligations.  The misrepresentation breaches the WMC Representations and Warranties in Schedule III (22), (35), (64), (17), (11) and/or (57) of the PSA.

60.     Many of the WMC Representations and Warranties could be breached without WMC knowing of – or even having reason to know of – misrepresentations in the documentation.  WMC chose to take on the risk that borrowers might provide false information in their loan documentation and certificateholders relied upon the WMC Representations and Warranties to that end.

### 4.     **Materiality**

61.     The breaches of the WMC Representations and Warranties identified by the Loan Review materially and adversely affect the value of the Mortgage Loans or the interest of the Trustee or the certificateholders therein.

62.     Over 94 percent of the Reviewed Loans breach WMC Representations and Warranties that are Deemed Material and Adverse Representations under the PSA.  Thus, with regard to the vast majority of breaching loans, WMC has contractually agreed that at least one breach of the WMC Representations and Warranties materially and adversely affects the value of the Mortgage Loan or the interest of the Trustee or the certificateholders therein.

63.     Additionally, the breaches of the WMC Representations and Warranties relate to the credit quality of the borrower, the ability of the borrower to repay the mortgage loan, the amount of collateral securing the mortgage loan and the enforceability of the underlying mortgage loan.  Each such breach "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein" because the breach interferes

with the evaluation and pricing of the risks and potential return associated with investing in the Mortgage Loan.

64.     The Loan Review and the detailed loan-by-loan and breach-by-breach descriptions set forth in Exhibit B, reflect that at least 99.7 percent of the Non-Performing Loans breach one or more WMC Representations or Warranties in a manner that materially and adversely affects the value of the Mortgage Loan or the interest of the Trustee or the certificateholders therein.

        B.     The Trustee Makes A Repurchase Demand

65.     By letter dated April 16, 2012, the Trustee notified WMC of the breaches in the Sample Loans (the "April 16 Repurchase Demand Letter").  A copy of the April 16 Repurchase Demand Letter is attached as Exhibit C, and incorporated herein by reference.

66.     The April 16 Repurchase Demand Letter demanded that WMC fulfill its obligations under the PSA to:  (i) repurchase the 401 breaching loans at the Repurchase Price, as set forth in Section 2.03(f) of the PSA; (ii) repurchase 99.7 percent of the Non-Performing Loans at the Repurchase Price, based on the breach rate in the sample; and (iii) indemnify the Trustee for breaches of the WMC Representations and Warranties pursuant to Section 2.03(l) of the PSA.

67.     In the April 16 Repurchase Demand Letter, the Trustee provided WMC with multiple charts containing thousands of rows of detailed descriptions of the breaches of the WMC Representations and Warranties identified in the Sample Loans.  Additionally, as a courtesy, the Trustee provided for each breaching Mortgage Loan a PDF document containing documentation supporting the breaches, amounting to thousands of pages of additional material.

68.     As described above, without prejudice to the April 16 Repurchase Demand Letter, the Trustee also provided WMC with additional loan-by-loan bases for demanding repurchase of

994 of the 1,000 Additional Loans.  These additional repurchase demands were sent to WMC in

letters dated April 25, 26 and 27, 2012 (collectively, the "Additional Repurchase Demand

Letters" and together with the April 16, 2012 Repurchase Demand Letter, the "Repurchase

Demand Letters"), each of which contained the same level of detailed notice that was provided to

WMC in connection with the Sample Loans in the April 16 Repurchase Demand Letter.  Copies

of the Additional Repurchase Demand Letters are attached as Exhibits D (the April 25, 2012

letter), E (the April 26, 2012 letter), and F (the April 27, 2012 letter), and are incorporated herein

by reference.

69.     The Repurchase Demand Letters were sent to WMC promptly upon discovery of

the breaches.  Altogether, the Loan Review entailed a review of over 830,000 pages of Mortgage

Loan Files and provided detailed loan-by-loan bases for demanding repurchase of the loans.

**IV.     WMC Breaches its Repurchase and Indemnification Obligations**

70.     Pursuant to Section 2.03(f) of the PSA, WMC was required to repurchase the

loans identified in the Trustee's Repurchase Demand Letters within 60 days after the date on

which it received the letters.

71.     In a letter from WMC's general counsel to the Trustee's outside counsel dated

May 17, 2012, WMC acknowledged receiving the Repurchase Demand Letters and demanded

from the Trustee further information not required by the PSA or relevant to the repurchase

demands.  WMC claimed that it "requires the requested information in order for it to determine

whether any duty to cure or repurchase any of the loans exists."  WMC further said that it did not

believe its obligation to cure or repurchase the loans would be triggered until WMC received all

of the information it requested.

72.     In a letter dated May 23, 2012, the Trustee stated its disagreement with the assertions made in WMC's May 17, 2012 letter and urged WMC to comply with its contractual obligations under the PSA.  WMC responded in a letter dated June 15, 2012, claiming that "based on the information currently available to it, WMC is not in a position to grant the Repurchase Requests.  The Trustee has not provided WMC with 'prompt written notice' of and an opportunity to cure any breach of WMC's representations and warranties that 'materially and adversely affects' the value of any claimed Breaching Loan or Breaching Subject Loan. Therefore, under Section 2.03 of the PSA, WMC does not have any obligation to repurchase any such loans."

73.     WMC's refusal to acknowledge the sufficiency of the notice provided by the Trustee's Repurchase Demand Letters is consistent with Defendants' publicly stated policy to, in all cases, "refute every loan" when presented with repurchase demands.  Specifically, Mark Begor (President and CEO, GE Capital Real Estate and President and CEO, GE Capital Restructuring Operations), the executive responsible for managing Defendants' handling of loan repurchase demands publicly boasted to investors on a conference call that "[i]f you've seen some of our results you know that we refute every loan."  GE Capital Investor Webcast, December 7, 2010.

74.     On June 19, 2012, with full knowledge of the Trustee's imminent plan to file suit to enforce WMC's obligations under the PSA, WMC filed a declaratory relief action in federal court in the Central District of California.  WMC's complaint seeks no affirmative relief, but rather seeks a judicial declaration that the lawsuit WMC knew the Trustee would imminently file – this lawsuit – lacks merit.  Compl., June 15, 2012, 8:12-cv-00972-JVS-JPR (C.D. Cal.).

75.     The sixty-day period prescribed under Section 2.03(f) of the PSA has expired and WMC has not cured or repurchased any of the Mortgage Loans identified in the Trustee's Repurchase Demand Letters.

76.     The Trustee, Trust and its investors have incurred legal fees, costs and expenses resulting from WMC's breaches of the WMC Representations and Warranties and its breach of its Repurchase and Indemnification Obligations.  The Trustee expects such expenses to continue to accrue for so long as WMC remains in breach of its obligations.  Accordingly, the Indemnification Obligation has both matured and continues to accrue with respect to existing and future claims.

77.     WMC has refused to indemnify the Trustee or the Trust for expenses resulting from WMC's breaches of the WMC Representations and Warranties and its breach of its Repurchase Obligation.

## V.      WMC Is An Alter Ego of GE Capital

78.     WMC operated as GE Capital's subprime lending arm and does not have an identity distinct from GE Capital.  As WMC's CEO, Laurent Bossard, testified to the U.S. Senate Committee on Banking, Housing and Urban Affairs on March 22, 2006, "GE Money made the decision post-acquisition to place WMC's mortgage operations under federal regulation.  This was accomplished by bringing the mortgage business under GE Money's Federal Savings Bank."

79.     WMC shared offices in Burbank, California with GE Capital's consumer finance division.  The two purportedly separate companies operated out of the same offices throughout the relevant period surrounding the facts alleged in this Complaint.  WMC's employees were also GE Capital employees.

80.     The fused identities of WMC and GE Capital carried through to the companies'

product line.  On July 15, 2005, WMC launched a program called "WMC Select," which was

said to allow "greater flexibility in qualifying the borrower for a loan since the borrower selects

the loan features most important to him."  Notably, WMC stated in SEC filings, "WMC Select is

offered by GE Money Bank."  Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-

Through Certificates, Series 2007-6, Filing on Form 424B5 at S-85 (filed June 29, 2007).

81.     WMC and GE Capital presented themselves to the world as one entity, with GE

Capital providing financial backing for WMC.  For example, at an American Securitization

Forum presentation in 2007, WMC distinguished itself from its competition by citing its "GE

Support," which provided WMC access to GE Capital's "institutional resources and balance

sheet."  WMC further pitched itself as having "GE purchase power."

82.     As of January 1, 2007, WMC assigned substantially all of its mortgage origination

operations, including its broker relationships, to GE Capital's GE Money Bank and transferred

all of its employees to WMC-GEMB Mortgage Corp., a wholly owned operating subsidiary of

GE Money Bank.  On January 2, 2007, GE Money Bank commenced doing business as "WMC

Mortgage" and began originating and acquiring mortgage loans.

83.     GE Capital's restructuring and reorganization of WMC resulted in the ostensible

transfer of WMC's Repurchase and Indemnification Obligations to the new, undercapitalized

WMC Mortgage, LLC.

84.     The core strategic decisions concerning GE Capital's WMC business continued to

be made by GE Capital.  For example, on an investor conference call, Mark Begor, (President

and CEO, GE Capital Real Estate, and President and CEO, GE Capital Restructuring

Operations), discussed GE Capital's reserves for "potential future repurchases that may come

23

from investors from loans that we have sold in the past."  Mr. Begor explained that GE Capital –

controlling WMC's business – "put in a new leadership team," and in connection with these

changes imposed by GE Capital, "we fixed underwriting" and now "we are no longer writing to

Wall Street guidelines, we are underwriting to our guidelines."  General Electric Company

Earnings Call, April 13, 2007.

85.    Over the last few years, GE Capital's public statements have indicated that it is

aware that GE Capital is ultimately responsible for WMC's repurchase and indemnification

obligations arising out of WMC's subprime mortgage origination business.  Indeed, as stated

above, GE Capital's Mark Begor said to investors in regards to loan repurchase demands

asserted against WMC that: "[i]f you've seen some of our results you know that we refute every

loan, and we've had a success rate of defending that claim in GE's favor at well over 80%, close

to 84%."  GE Capital Investor Webcast, December 7, 2010.

86.    In addition, GE Capital stated in its SEC disclosures that soon after folding WMC

into GE Money Bank, GE Capital sold its WMC mortgage business in the fourth quarter of 2007.

In referring to this sale, GE Capital informed the SEC that "[u]pon sale, we retained contractual

obligations to repurchase previously sold loans as to which there was an early payment default or

with respect to which certain contractual representations and warranties were not met."  June 29,

2010 letter from GE Capital to the SEC regarding 12/31/2008 10-K, at p. 8 (filed on July 2,

2010).

87.    In recognition of Defendants' Repurchase and Indemnification Obligations arising

out of the WMC Representations and Warranties, GE Capital continues to record reserves on its

consolidated balance sheet for repurchase requests based upon pending and estimated future loan

repurchase requests.

88.     When asked on a GE earnings call about indications on GE's 10-Ks that "you do actually retain some sort of obligation for liabilities or loans previously sold" by WMC, Keith S. Sherin, Vice Chairman and CFO of GE, did not dispute GE's retention of WMC's repurchase obligations.  General Electric Company Earnings Call, October 15, 2010.

89.     Today, GE Capital's WMC mortgage business is being wound down and Defendants are responsible for responding to repurchase demands.  The decision to not fulfill Defendants' Repurchase and Indemnification Obligations was made by GE Capital from its Connecticut headquarters.

## CLAIMS FOR RELIEF

### Count I
### Breach of Contract – Breach of WMC Representations and Warranties

90.     Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

91.     As part of the PSA, WMC made numerous WMC Representations and Warranties regarding the Mortgage Loans.  These WMC Representations and Warranties were made by WMC for the benefit, inter alia, of the Trustee.

92.     WMC has breached the WMC Representations and Warranties as set forth in the Repurchase Demand Letters.

93.     The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.

94.     As a direct and proximate cause of WMC's breaches of the WMC Representations and Warranties, the Trust has suffered and continues to suffer significant damages.

25

95.     Defendants are liable for WMC's breach of the WMC Representations and Warranties.

## Count II
### Breach of Contract – Failure to Repurchase Mortgage Loans

96.     Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

97.     WMC has breached its Repurchase Obligation by failing to cure the breaches of the WMC Representations and Warranties identified in the Repurchase Demand Letters in all material respects or repurchase the Mortgage Loans at the specified repurchase price.

98.     The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.

99.     As a direct and proximate cause of WMC's breach of its Repurchase Obligation, the Trust has suffered and continues to suffer significant damages.

100.    Defendants are liable for WMC's breach of its Repurchase Obligation.

## Count III
### Breach of Contract – Failure to Indemnify

101.    Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

102.    WMC has breached its Indemnification Obligation by failing to indemnify the Trustee and the Trusts for the costs and expenses, including the cost of loan reviews and legal costs, resulting from WMC's breaches of the WMC Representations and Warranties.

103.    The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.

104.    As a direct and proximate cause of WMC's breaches of its Indemnification Obligation, the Trustee and the Trustee have suffered and continue to suffer significant damages.

105.    Defendants are liable for WMC's breach of its Indemnification Obligation.

## DEMAND FOR RELIEF

WHEREFORE, the Trustee requests that the Court enter a judgment in its favor against Defendants, in an amount to be determined at trial, plus pre- and post-judgment interest, costs of suit, and attorneys' fees; and/or such other relief as the Court may deem just.

PLAINTIFF DEUTSCHE BANK NATIONAL
TRUST COMPANY, SOLELY AS TRUSTEE
FOR MORGAN STANLEY ABS CAPITAL I INC.
TRUST 2006-WMC2

By: /s/ Thomas D. Goldberg
Thomas D. Goldberg (ct 04386)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
Tel.: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com

Of Counsel

BOIES, SCHILLER & FLEXNER LLP

Robin A. Henry
Motty Shulman
Joseph F. Kroetsch

333 Main Street
Armonk, NY 10504
914-749-8200

*Its Attorneys*

28