## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, solely as Trustee for the MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-WMC2, | 12 Civ. 933 (CSH) |
| | ECF CASE |
| Plaintiff, | May 9, 2014 |
| v. | |
| WMC MORTGAGE L.L.C., as successor-by-merger to WMC Mortgage Corp., | |
| Defendant. | |

## AMENDED COMPLAINT

Plaintiff Deutsche Bank National Trust Company ("DBNTC"), solely in its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2 (the "Trustee"), for its Complaint against WMC Mortgage, L.L.C. ("WMC" or "Defendant"), alleges upon information and belief as follows:

## SUMMARY OF CLAIMS

1.      This action arises out of WMC's failure to honor its contractual mortgage notice, repurchase, and indemnification obligations to the Trustee.

2.      The Trust was formed as part of a $2.6 billion residential mortgage securitization sponsored by Morgan Stanley Mortgage Capital Inc. and its affiliated entities.  At the time of securitization, all rights, title, and interest to a pool of mortgage loans with an unpaid principal balance of more than $2.6 billion were conveyed to the Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2 (the "Trust").  The pool of mortgage loans was originally owned by WMC and, in connection with the acquisition of the loans, WMC made numerous representations and

warranties relating to their nature and quality.  Independent of its representations and warranties, WMC also took upon itself certain repurchase, notice, and indemnification obligations to ensure that the Trustee would receive the benefit of its bargain.

3.      In connection with the mortgage securitization, WMC agreed to act as the "Responsible Party" and in that role entered into a Pooling and Servicing Agreement dated as of June 1, 2006 (together with its schedules, exhibits and amendments, the "PSA").  As Responsible Party, WMC made 68 specific representations and warranties about the nature and quality of the mortgage loans in the Trust.  These representations and warranties relate to, among other things, the ability of the borrower to make his or her monthly mortgage payment and the security of the collateral supporting the loan.

4.      As Responsible Party, WMC also took upon itself the independent obligation to repurchase from the Trust, within 60 days of the earlier of either discovery by or notice to WMC, any mortgage loan in breach of a representation or warranty that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."  PSA § 2.03(f).  For many of the 68 representations and warranties set forth in the PSA, WMC agreed in advance that any breach of those representations and warranties would "be deemed automatically to materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificateholders in such Mortgage Loan."  *Id.*  WMC further agreed to provide "prompt written notice" upon discovery of a breach.  *Id.* § 2.03(e).

5.      In addition to undertaking its repurchase and notice obligations, WMC also agreed to indemnify, among others, the Trustee and Trust for any losses, legal fees, costs or expenses "resulting from any claim, demand, defense or assertion based on or grounded upon, or

resulting from, a breach by the Responsible Party of any of its representations and warranties or obligations as Responsible Party contained in this Agreement." PSA § 2.03(l).

6.      At the direction of an investor in the Trust, in January 2012, the Trustee commissioned a review into whether certain mortgage loans owned by the Trust breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein." PSA § 2.03(f). The investor-directed review was conducted in two steps.

7.      *First,* an independent expert statistician was retained to randomly select a statistically representative sample from a pool of 5,342 non-performing loans with an original principal balance of over $1.2 billion. The statistically representative sample of over 400 loans was then re-underwritten and reviewed on a loan-by-loan basis. Over 99.7 percent of the sampled mortgage loans – and as a statistical matter over 99.7 percent of the population of 5,342 non-performing loans – breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein." *Id.*

8.      *Second*, a group of 1,000 additional mortgage loans from the same pool of 5,342 non-performing loans was selected. The 1,000 mortgage loans, with an original principal balance of over $400 million, were then re-underwritten and reviewed on a loan-by-loan basis. The breach rate on this group of loans was in excess of 99.7 percent, which is consistent with the breach rate observed in the statistically representative sample.

9.      Promptly after the investor-directed loan review was concluded, the Trustee, based on that review, gave WMC written notice that over 99.7 percent of the sampled mortgage loans – and as a statistical matter over 99.7 percent of the population of 5,342 non-performing

loans – breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."  *Id.*  The Trustee provided WMC with detailed loan-by-loan and breach-by-breach descriptions along with thousands of pages of supporting documentation. Pursuant to Section 2.03 of the PSA, the Trustee demanded that:  (i) WMC repurchase the breaching loans; and (ii) WMC indemnify the Trustee for its costs and expenses as provided for in Section 2.03(l) of the PSA.

10.    WMC and its parent corporation, General Electric Capital Corp. ("GE Capital"), have a stated policy of "refut[ing] every loan" for which repurchase is demanded.  Accordingly, WMC has refused to honor its repurchase, notice, and indemnification obligations and has even refused to acknowledge that the detailed breach notices and thousands of pages of information that the Trustee provided to WMC triggered WMC's repurchase obligation under Section 2.03 of the PSA.

11.    As a result of WMC's breach of its representations and warranties, as well as Defendant's breach of its independent contractual obligations to repurchase and indemnify the Trustee and Trust, the Trust has been injured in an amount that exceeds $650 million.

## PARTIES

12.    DBNTC is a national banking association organized under the laws of the United States of America to carry on the business of a limited purpose trust company.  DBNTC's main office is located at 2000 Avenue of the Stars, 9th Floor, North Tower, Los Angeles, California 90067, and its trust administration offices are located at 1761 East St. Andrew Place, Santa Ana, California 97025.  DBNTC brings this action solely in its capacity as Trustee of the Trust, and not in its individual capacity.

13.     Pursuant to Section 2.01(a) of the PSA, the Trustee holds "all the right, title and interest of the Depositor in and to the Trust Fund" for the benefit of the certificateholders in the Trust (the "Certificateholders") and as such has standing and authority to sue on the Trust's behalf.

14.     The Trustee commences this lawsuit upon the written direction of certain Certificateholders pursuant to Article VIII of the PSA, and any conditions precedent to filing suit have been satisfied or deemed futile.

15.     The Trust was formed as of June 28, 2006, pursuant to the PSA.  The Trust is a New York common law trust created by written instruments manifesting the express intention to create a trust and setting forth the subject, purpose, and beneficiaries of the Trust.  The Trustee brings this action pursuant to Federal Rule of Civil Procedure 17(a)(1)(E) as trustee of an express trust for the benefit of the Trust and the investors in the Trust.

16.     WMC is a limited liability company organized under the laws of the State of Delaware, with offices in Woodland Hills, California and with its principal place of business in Connecticut.  WMC's business is directed, controlled, and coordinated from the offices of its sole member, GE Capital, a Delaware corporation whose principal place of business is Norwalk, Connecticut.

17.     WMC is the successor entity to WMC Mortgage Corp., which originated residential home mortgage loans.  WMC Mortgage Corp. was licensed by the Connecticut Department of Banking as a Mortgage Lender/Broker and was registered with the Connecticut Secretary of State as a foreign corporation doing business in Connecticut.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship existing between the parties and because the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because WMC resides within this judicial district and because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.

**FACTUAL ALLEGATIONS**

I.     **Securitization of Mortgage Loans**

20.     Securitization is a common financing tool used to pool and convert assets such as residential mortgages into financial instruments that can be sold in the capital markets. Mortgages on residential real estate are commonly securitized because the borrower has an obligation to make periodic, usually monthly, payments, which offer investors a consistent and predictable cash flow.

21.     Generally speaking, the entity that makes residential mortgage loans to homeowners is called the "originator" of the loans.  The process by which the originator decides whether to make a particular loan is known as the "underwriting" of the loan.  The general purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them, and that the loans are made only against sufficient collateral.  In the loan underwriting process, the originator applies underwriting guidelines to assess the creditworthiness of the borrowers and the sufficiency of the collateral, *i.e.*, the value of the home.

22.     The securitization process begins with the pooling of a large number of loans, usually of a similar type, into a collateral pool.  The originator of the loans sells a pool of loans

6

(directly or indirectly) to a special-purpose entity known as a "depositor," which in turn sells the mortgage loans to a trust.  Generally speaking, the loans are directly or indirectly purchased from the originator using funds raised by the selling of residential mortgage backed securities ("RMBS"), also known as "certificates," to investors.

23.     By purchasing RMBS, or certificates, investors acquire the right to receive monies from the cash flows of the underlying mortgage loans or their proceeds (such as loan principal and interest or the proceeds from the liquidation of loan collateral).  These cash flows are paid to RMBS investors pursuant to a contractually specified distribution plan and schedule.

24.     For an investor, the credit quality of the underlying mortgage loans, the amount of collateral securing the loans, and the enforceability of the underlying mortgage loans are of paramount importance when choosing to invest in RMBS.  These factors, as well as others, directly affect the cash flow generated by the underlying loans and therefore the value of the certificates.  Information about the credit quality of the underlying mortgage loans, the amount of collateral securing the loans, and the enforceability of the underlying mortgage loans is usually contained in a file that the originator develops while underwriting and issuing the mortgage loan.

25.     For residential mortgage loans, the loan file typically contains documents such as the borrower loan application, credit reports, and property appraisals.  The loan file should also include notes from the loan underwriter about the loan's compliance with the originator's underwriting standards.

26.     Investors are generally not able to review the loan files before deciding whether to invest in RMBS.  Instead, investors rely upon representations and warranties made by the originator or other "responsible party" about the contents of the loan file, the loans' credit quality, and the loan's collateral or security.

27.     These representations are made by the originator or another "responsible party" to the trustee and other parties for the benefit of the trust and purchasers of the RMBS.  These representations and warranties are important to investors, as is the originator's or "responsible party's" independent contractual obligation to repurchase any mortgage loans that breach the representations and warranties in a manner that materially and adversely affects the value of the mortgage loans or the investors' interests therein.  The security provided by these representations and obligations is central to a certificateholder's decision to invest in RMBS.

## II.     The Pooling and Servicing Agreement

28.     The Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2 securitization (the "MSAC Securitization") was arranged and sponsored by Morgan Stanley Mortgage Capital Inc. The mortgage loans included in the Trust were primarily fixed and adjustable rate subprime mortgage loans secured by first-lien and second-lien mortgages or deeds of trust on residential properties.  All of the mortgage loans in the MSAC Securitization were purchased from WMC.

29.     The MSAC Securitization was effectuated by Morgan Stanley ABS Capital I Inc. (the "Depositor") purchasing, through its parent company, a pool of mortgage loans from WMC (the "Trust Fund").  The Depositor then conveyed "without recourse, all the right, title and interest of the Depositor in and to the Trust Fund" to the Trustee for the benefit of the Certificateholders.  PSA § 2.01(a).  The transaction was conducted pursuant to the PSA, which sets forth the obligations of the various parties.

30.     The PSA for the Trust is dated June 1, 2006, and was entered into among the Trustee, Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, N.A. ("Wells Fargo"), as Servicer, Master Servicer, Securities Administrator and Custodian, and WMC, as Responsible Party.  A copy of the PSA is attached hereto as Exhibit A, and incorporated herein

8

by reference.  Between June 1, 2006 and the PSA's "Closing Date" of June 28, 2006, the mortgage loan pool was subject to change.  *See* Ex. G, at S-26.  Schedule I of the PSA contained a Mortgage Loan Schedule identifying the mortgage loans in the Trust (the "Mortgage Loans"), as well as pertinent identifying characteristics of the Mortgage Loans.

> A.  **WMC's Representations and Warranties**

31.     Section 2.03(b) and Schedules III and IV of the PSA set forth a series of representations and warranties that WMC, as Responsible Party, made to the Trustee and others (the "WMC Representations and Warranties").  Schedule III of the original PSA includes 67 specific representations and warranties concerning the nature, characteristics, history, and quality of the Mortgage Loans and the loan files (the "Mortgage Loan Files") sold to the Trust.  Amendment No. 1 to the PSA, dated November 7, 2006, amends Schedule III to add one additional representation and warranty.  The WMC Representations and Warranties, including the one contained in Amendment No. 1, were all made as of June 28, 2006.

32.     The WMC Representations and Warranties are too numerous to set forth in their entirety here, but are included in Schedule III of the PSA (Exhibit A) and incorporated herein by reference.  Set forth below, verbatim from the PSA, are examples of the more commonly breached WMC Representations and Warranties:

> **Schedule III (64)**: Underwriting Methodology.  The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the related Mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the related Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan.  This representation and warranty is a Deemed Material and Adverse Representation.

> **Schedule III (57)**: Origination.  No predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor

9

to repay and the extension of credit which has no apparent benefit to the Mortgagor, were employed in the origination of the Mortgage Loan.

**Schedule III (11)**:   Validity of Mortgage Documents.   The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to prepayment penalties), subject to bankruptcy, equitable principles and laws affecting creditor rights.   All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties.   No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller in connection with the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan.   Notwithstanding the foregoing, but without limiting the other representations and warranties set forth elsewhere in this Agreement, if any error, omission or negligence in the origination of such Mortgage Loan occurred despite Seller's conformance with its Underwriting Guidelines (as in effect at the time such Mortgage Loan was made), then there shall be a presumptive conclusion that there was no error, omission or negligence.   No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of any Person (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan.   The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

**Schedule III (17)**:   No Defaults.   As of the related Servicing Transfer Date, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration, and neither the Seller nor any of its affiliates nor any of their respective predecessors, have waived any default, breach, violation or event which would permit acceleration.

**Schedule III (22)**:   Conformance with Agency and Underwriting Guidelines.   The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller (a copy of which is attached to each related Assignment and Conveyance Agreement).  The Mortgage Note and Mortgage are on forms acceptable to prudent mortgage lenders in the secondary mortgage market and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used.

33.    The PSA also provides that for many of the 68 WMC Representations and Warranties in Schedule III, a breach "will be deemed automatically to materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificateholders in such Mortgage Loan" (the "Deemed Material and Adverse Representations").  PSA § 2.03(f); Schedule III.

**B.    WMC's Notice Obligation**

34.    Although all ownership rights and interest in the Mortgage Loans were conveyed to the Trustee for the benefit of the Trust's Certificateholders as of June 28, 2006, pursuant to Section 2.02 of the PSA, the mortgage loans and loan files, including the origination files, were to be maintained by Wells Fargo, as Custodian, on behalf of the Trustee and the Trust.

35.    Given this arrangement, the PSA imposes a continuing and independent duty upon all parties, including WMC, to provide notice of breaches of the WMC Representations and Warranties to the other parties (the "Notice Obligation").

36.    Specifically, Section 2.03(e) of the PSA provides that "[u]pon discovery by any of the Responsible Party, the Depositor, the Trustee or the Servicer of a breach of any of the foregoing representations and warranties that materially and adversely affect the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the party discovering such breach shall give prompt written notice to the other parties."

**C.    WMC's Repurchase Obligation**

37.    As Responsible Party, WMC assumed the continuing and independent obligation to either cure or repurchase any Mortgage Loan that is in breach of a representation or warranty that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein" (the "Repurchase Obligation").  PSA § 2.03(f).

38.     Specifically, Section 2.03(f) of the PSA states, in pertinent part, as follows:

… within 60 days of the earlier of either discovery by or notice to the Responsible Party of any breach of a representation or warranty, set forth in Section 2.03(b), that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Responsible Party shall use commercially reasonable efforts to cause to be remedied a material defect in a document constituting part of a Mortgage File or promptly to cure such breach in all material respects and, if such defect or breach cannot be remedied, the Responsible Party shall … repurchase such Mortgage Loan at the Repurchase Price….   Notwithstanding the foregoing, a breach (i) which causes a Mortgage Loan not to constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code or (ii) by the Responsible Party of any of the representations and warranties set forth in clause (43), (44), (46), (48), (50), (52), (53), (54), (55), (56), (57), (58), (59) or (69) of Schedule III, in each case, will be deemed automatically to materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificateholders in such Mortgage Loan.

Ex. A at 76-77.

39.     WMC's Repurchase Obligation requires WMC to "repurchase such Mortgage Loan at the Repurchase Price."  PSA § 2.03(f).  As defined by the PSA, this means that WMC is obligated to purchase from the Trust any breaching Mortgage Loan, including any liquidation, insurance or REO proceeds of a breaching loan, for an:

amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid and distributed to the Securities Administrator to the date of repurchase, (iii) all unreimbursed Servicing Advances and (iv) all costs and expenses incurred by the Trustee arising out of or based upon such breach, including without limitation, costs and expenses relating to the Trustee's enforcement of the Responsible Party's repurchase obligation hereunder.

Ex. A at p. 49.

40.     WMC agreed to cure or repurchase any breaching Mortgage Loan regardless of the Loan's performance.  The PSA makes clear that WMC's Repurchase Obligation continues regardless of whether any breaching Mortgage Loan is modified, foreclosed, or liquidated.

Indeed, the contractually defined "Repurchase Price" references the contractually defined term

"Mortgage Loan," which is defined to include, without limitation:

> the Mortgage File, the Scheduled Payments, Principal Prepayments, *Liquidation Proceeds*, Condemnation Proceeds, Insurance Proceeds, *REO Disposition proceeds*,[1] Prepayment Charges, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan, excluding replaced or repurchased Mortgage Loans.

Ex. A at p. 35 (emphasis added).  Thus, the definition of "Mortgage Loan" in the PSA explicitly

*includes* liquidated Mortgage Loans.

41.     The Prospectus Supplement issued in connection with the Trust discloses

numerous "risk factors" potentially relevant to an investor's decision whether to purchase

certificates.  Those risk factors do not include the risk that certificates would lose value because

breaching loans were liquidated and could not be repurchased.  A copy of the Prospectus

Supplement is attached hereto as Exhibit G.

42.     Accordingly, under the PSA, WMC must repurchase materially breaching

Mortgage Loans, even if those loans have been liquidated.  A contrary understanding would

allow WMC to avoid its contractual obligations simply by "running out the clock" through

refusals and litigation until circumstances require liquidation of the loans to protect the Trust's

interests.  The PSA parties did not intend that perverse result.  Rather, the parties' course of

dealing, the PSA's inclusion of a damages remedy for breaches, and WMC's repurchases of

liquidated loans all show that the parties meant for the Trustee to recover from WMC for all

defective loans, including liquidated loans.

---

[1] An "REO Disposition" is the final sale of "REO Property," which the PSA defines as "[a] Mortgaged Property acquired by the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan."  Ex. A at 48-49.

43.     In addition, within the residential mortgage-backed security ("RMBS") industry, "repurchase" obligations like those set forth in the PSA are generally understood to encompass a seller's broad and general duty to make a mortgage loan buyer whole regardless of whether the loan is performing or non-performing, active or liquidated.  Upon information and belief, even WMC has repurchased liquidated loans in other securitizations with which it was involved.  For example, in the MASTR Asset Backed Securities Trust 2006-WMC2 and the MASTR Asset Backed Securities Trust 2007-WMC1 securitizations, monthly reports made available to investors suggest that liquidated WMC loans have been repurchased.

44.     WMC's Repurchase Obligation is a valuable and important right because many of the mortgage loans sold to, and deposited in, the Trust are subprime and were made to borrowers who represent higher credit risks than traditional borrowers.  Thus, seemingly small differences in a borrower's qualifications, the terms of the mortgage loan, the quality and value of mortgage loan collateral, or the integrity of the mortgage loan origination process could materially and adversely affect the value of the Mortgage Loans or the interests of the Trustee or Certificateholders.

### D.      WMC's Indemnification Obligation

45.     Independent of its Repurchase Obligation, WMC is obligated to indemnify the Trustee and Trust for any losses or expenses incurred in, among other things, enforcing the rights of the Trust against WMC (the "Indemnification Obligations").

46.     Specifically, Section 2.03(l) of the PSA states, in pertinent part, as follows:

In addition to such repurchase or substitution obligation, the Responsible Party shall indemnify the Depositor and its Affiliates, the Servicer, the Sponsor, the Securities Administrator, the Trustee, the Custodian and the Trust and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses resulting from any claim, demand, defense or assertion based on or

14

grounded upon, or resulting from, a breach by the Responsible Party of any of its representations and warranties or obligations as Responsible Party contained in this Agreement.

## III.   WMC Breached the WMC Representations and Warranties

### A.   The Review of the Mortgage Loans

47.     In October 2011, an investor, pursuant to Section 8.02(d) of the PSA, directed the Trustee to commission an assessment of whether certain mortgage loans in the Trust breached the WMC Representations and Warranties.   Specifically, the Trustee was instructed to commission a review of 5,342 non-performing mortgage loans identified by the instructing certificateholder (the "Non-Performing Loans").

48.     The Trustee promptly requested that Wells Fargo, as Servicer, provide the Trustee with the Mortgage Loan Files for the Non-Performing Loans.  The Trustee received access to the loan files in late January 2012, and, pursuant to the investor's direction, promptly caused a detailed review of the Non-Performing Loans (the "Loan Review") to be conducted.

#### 1.   Sampling and Review of the Non-Performing Loans

49.     In connection with the Loan Review, the Trustee retained an expert to independently and randomly select a statistically representative sample of the Non-Performing Loans to review for possible breaches of the WMC Representations and Warranties.  The sample was generated using a methodology that is generally accepted in the scientific community such that the breach rate derived from an examination of the sample is accurate with respect to the entire population of Non-Performing Loans within a statistically significant 95 percent confidence range.

50.     The sample was selected using a methodology known as "random sampling with replacement."  Under this methodology, after a loan is randomly selected from the population of

Non-Performing Loans it is returned to the population and then a second loan is selected at random.   This methodology keeps the selection pool constant and results in a more accurate sample.

51.     To ensure that the sample included at least 400 unique loans, 420 selections were taken from the population of Non-Performing Loans, including the loans randomly chosen more than once.  In total, 402 unique Mortgage Loans were included in the statistically representative sample (the "Sample Loans").

52.     The Loan Review entailed a detailed forensic re-underwriting of each Sample Loan.  This re-underwriting was completed by a team of skilled underwriters who completed a rigorous training program in re-underwriting the relevant vintage of loan production (the "Level 1 Review").   The relevant underwriting guidelines (the "Underwriting Guidelines") were furnished to all parties reviewing the files, and the complete loan files, each approximately 600 pages long on average, were reviewed and analyzed.

53.     After the initial Level 1 Review was completed, each breach finding was subject to a quality control review (the "Level 2 Review").

54.     Following the Level 2 Review, all the findings were reviewed by an independent expert with over thirty years of mortgage banking and underwriting experience (the "Level 3 Review").

55.     The review of the Sample Loans identified in 401 of the 402 unique Sample Loans breaches of the WMC Representations and Warranties that materially and adversely affect the value of the Sample Loans or the interest of the Trustee or Certificateholders – a statistically representative breach rate of over 99.7 percent.  The review also showed that the Sample Loans

breached multiple WMC Representations and Warranties.  On average there were more than five breaches of the WMC Representations and Warranties per breaching Sample Loan.

### 2.      The Additional Loan Reviews

56.      The statistical sampling used to select the Sample Loans is an appropriate methodology by which a statistically representative breach rate can be identified and repurchases demanded pursuant to the PSA, but WMC has generally taken the position that statistical sampling of loans does not provide a valid basis upon which to assert a repurchase demand.

57.      Out of an abundance of caution and without prejudice to the population-wide repurchase demands based on the Sample Loans, additional loan reviews were performed on a 1,000-loan subset of the 5,342 Non-Performing Loans (the "Additional Loans").  This set of 1,000 Additional Loans did not include any of the Sample Loans.

58.      The review of the Additional Loans was conducted using the same re-underwriting and quality control process described in paragraphs 52 to 54, above.

59.      Of the 1,000 mortgage loans that were reviewed in connection with the Additional Loans, 994 mortgage loans breach the WMC Representations and Warranties in a manner that materially and adversely affects the value of the Mortgage Loans or the interest of the Trustee or the Certificateholders.  These results are consistent with the breach rate of the Sample Loans.

### 3.      Types of Breaches

60.      The review of the Sample Loans and Additional Loans (collectively, the "Reviewed Loans") revealed that the vast majority of the Non-Performing Loans – indeed, nearly all – breached the WMC Representations and Warranties in a manner that materially and adversely affects the value of the Mortgage Loans or the interest of the Trustee or the Certificateholders therein.

61.     The breaches discovered through the Loan Review include breaches of numerous WMC Representations and Warranties in a variety of different manners.  Attached hereto as Exhibit B, and incorporated herein by reference, is a detailed loan-by-loan and breach-by-breach review of the Sample Loans and Additional Loans.

62.     Some of the more commonly-observed breaches include:

a.      **Mortgage Loan Schedule Discrepancy.**  The Mortgage Loan Schedule ("MLS") is prepared by the originator and contains information about the mortgage loans that are contained in a securitization.  For investors, it is the best – and often only – source of information about the pool of mortgage loans, and includes data such as the loan amount, documentation type, and occupancy status, among other things.  Over 90 percent of the Reviewed Loans were materially misstated by WMC on the MLS, thereby misleading investors about the quality and content of the mortgage loans in which they were investing.  These misstatements breach the WMC Representations and Warranties in Schedule III (1) and (11) of the PSA.

b.      **Excessive DTI.**  The Underwriting Guidelines place a limit on the amount of debt a borrower may have relative to his or her income.  This ratio is usually a material consideration for lenders because it directly relates to the borrower's expected ability to repay the mortgage loan.  For over 54 percent of the Reviewed Loans, this ratio, called the Debt-to-Income ratio (or "DTI"), exceeded the limits provided for in the Underwriting Guidelines.   Such DTI ratios breach the WMC Representations and Warranties in Schedule III (22), (35), (64), (11) and (57) of the PSA.

c.      **Misrepresentation of Income.**   In over 29 percent of the Reviewed Loans, the borrower misrepresented his or her income in the loan application.  This

misstatement breaches the WMC Representations and Warranties in Schedule III (22), (35), (64), (17), (11) and/or (57) of the PSA.

        d.    **Misrepresentation of Debt Obligations.**  The Underwriting Guidelines required the borrower to disclose all debt obligations on the mortgage application, including, for example, other mortgages and pending transactions that would result in new debt.  In over 18 percent of the Reviewed Loans borrowers failed to disclose existing or pending debt obligations.  The misrepresentation breaches the WMC Representations and Warranties in Schedule III (22), (35), (64), (17), (11) and/or (57) of the PSA.

63.    Many of the WMC Representations and Warranties could be breached without WMC knowing of – or even having reason to know of – misrepresentations in the documentation.  WMC chose to take on the risk that borrowers might provide false information in their loan documentation, and Certificateholders relied upon the WMC Representations and Warranties to that end.

        **4.**    **Materiality**

64.    The breaches of the WMC Representations and Warranties identified by the Loan Review materially and adversely affect the value of the Mortgage Loans or the interest of the Trustee or the Certificateholders.

65.    Over 94 percent of the Reviewed Loans breach WMC Representations and Warranties that are Deemed Material and Adverse Representations under the PSA.  Thus, with regard to the vast majority of breaching loans, WMC has contractually agreed that at least one breach of the WMC Representations and Warranties materially and adversely affects the value of the Mortgage Loan or the interest of the Trustee or the Certificateholders.

66.    Additionally, the breaches of the WMC Representations and Warranties relate to the credit quality of the borrower, the ability of the borrower to repay the mortgage loan, the amount of collateral securing the mortgage loan, and the enforceability of the underlying mortgage loan.  Each such breach "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein" because the breach interferes with the evaluation and pricing of the risks and potential return associated with investing in the Mortgage Loan.

67.    The Loan Review and the detailed loan-by-loan and breach-by-breach descriptions set forth in Exhibit B reflect that at least 99.7 percent of the Non-Performing Loans breach one or more WMC Representations or Warranties in a manner that materially and adversely affects the value of the Mortgage Loan or the interest of the Trustee or the Certificateholders.

68.    WMC was grossly negligent in originating and selling a set of loans with such pervasive and flagrant breaches.  Upon information and belief, discovery will show still further evidence of WMC's gross negligence regarding its origination practices.

**B.    The Trustee Makes A Repurchase Demand**

69.    By letter dated April 16, 2012, the Trustee notified WMC of the breaches in the Sample Loans (the "April 16 Repurchase Demand Letter").  A copy of the April 16 Repurchase Demand Letter is attached as Exhibit C, and incorporated herein by reference.

70.    The April 16 Repurchase Demand Letter demanded that WMC fulfill its obligations under the PSA to:  (i) repurchase the 401 breaching loans at the Repurchase Price, as set forth in Section 2.03(f) of the PSA; (ii) repurchase 99.7 percent of the Non-Performing Loans

at the Repurchase Price, based on the breach rate in the sample; and (iii) indemnify the Trustee for breaches of the WMC Representations and Warranties pursuant to Section 2.03(l) of the PSA.

71.     In the April 16 Repurchase Demand Letter, the Trustee provided WMC with multiple charts containing thousands of rows of detailed descriptions of the breaches of the WMC Representations and Warranties identified in the Sample Loans.  Additionally, as a courtesy, the Trustee provided for each breaching Mortgage Loan a PDF document containing documentation supporting the breaches, amounting to thousands of pages of additional material.

72.     As described above, without prejudice to the April 16 Repurchase Demand Letter, the Trustee also provided WMC with additional loan-by-loan bases for demanding repurchase of 994 of the 1,000 Additional Loans.  These additional repurchase demands were sent to WMC in letters dated April 25, 26 and 27, 2012 (collectively, the "Additional Repurchase Demand Letters" and together with the April 16, 2012 Repurchase Demand Letter, the "Repurchase Demand Letters"), each of which contained the same level of detailed notice that was provided to WMC in connection with the Sample Loans in the April 16 Repurchase Demand Letter.  Copies of the Additional Repurchase Demand Letters are attached as Exhibits D (the April 25, 2012 letter), E (the April 26, 2012 letter), and F (the April 27, 2012 letter), and are incorporated herein by reference.

73.     The Repurchase Demand Letters were sent to WMC promptly upon discovery of the breaches.  Altogether, the Loan Review entailed a review of over 830,000 pages of Mortgage Loan Files and provided detailed loan-by-loan bases for demanding repurchase of the loans.

**IV.**     **WMC Breaches its Repurchase, Notice, and Indemnification Obligations**

    **A.**     **WMC Breaches its Notice Obligation**

74.     The foregoing breaches – and many others – throughout the Mortgage Loans are so pervasive, and their nature so flagrant, that WMC must have discovered and known of them long before it received notice from the Trustee.

75.     WMC, which originated or acquired the Mortgage Loans, had first-hand access to loan files for those loans containing detailed information about borrowers' creditworthiness and the value of mortgaged property.  WMC further detailed to investors in the "Prospectus Supplement" how it had underwritten or re-underwritten all loans sold to the Trust in accordance with its underwriting guidelines, including both loans WMC had originated itself and loans WMC had acquired from third parties.  *See* Ex. G at S-28-S-39.  In particular, WMC described for investors how, for each Mortgage Loan, among other things it "verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant," "determine[s] the applicant's ability to repay the loan," and appraises the mortgaged property "for compliance with the WMC Underwriting Guidelines."  *Id.* at S-29.

76.     Given the pervasiveness of WMC's breaches, WMC must necessarily have discovered problems with the Mortgage Loans when it underwrote them in accordance with its own guidelines.  Further, in multiple cases, re-underwriting reveals that WMC had actual knowledge of borrower misrepresentation or other breaches from evidence available in the loan files themselves.

77.     Certificateholders and the Trustee, by comparison, lack such first-hand experience with the loan files.  Nor did the parties to the MSAC Securitization intend for the Trustee to

actively monitor WMC's compliance with its representations and warranties.  Rather, the PSA explicitly states that "the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document" such as WMC's representations and warranties or the Mortgage Loan files.  PSA § 8.02(d).

78.     Nevertheless, WMC has never issued written notification to the Trustee pursuant to Section 2.03(e) of the PSA indicating that it has discovered ***any*** breaches of its representations and warranties.

79.     WMC's breach of its notice duties is grossly negligent given that WMC had ample notice of pervasive problems with the Mortgage Loans.  Upon information and belief, discovery will show still further evidence of WMC's gross negligence regarding its failure to identify and notify other PSA parties of breaches of its representations and warranties.

### B.     WMC Breaches its Repurchase Obligation

80.     Pursuant to Section 2.03(f) of the PSA, WMC was required to repurchase the loans identified in the Trustee's Repurchase Demand Letters within 60 days after the date on which it received the letters.

81.     In a letter from WMC's general counsel to the Trustee's outside counsel dated May 17, 2012, WMC acknowledged receiving the Repurchase Demand Letters and demanded from the Trustee further information not required by the PSA or relevant to the repurchase demands.  WMC claimed that it "requires the requested information in order for it to determine whether any duty to cure or repurchase any of the loans exists."  WMC further said that it did not believe its obligation to cure or repurchase the loans would be triggered until WMC received all of the information it requested.

82.     In a letter dated May 23, 2012, the Trustee stated its disagreement with the assertions made in WMC's May 17, 2012 letter and urged WMC to comply with its contractual obligations under the PSA.  WMC responded in a letter dated June 15, 2012, claiming that "based on the information currently available to it, WMC is not in a position to grant the Repurchase Requests.  The Trustee has not provided WMC with 'prompt written notice' of and an opportunity to cure any breach of WMC's representations and warranties that 'materially and adversely affects' the value of any claimed Breaching Loan or Breaching Subject Loan. Therefore, under Section 2.03 of the PSA, WMC does not have any obligation to repurchase any such loans."

83.     WMC's refusal to acknowledge the sufficiency of the notice provided by the Trustee's Repurchase Demand Letters is consistent with the policy of WMC and its parent, GE Capital, to "refute every loan" when presented with repurchase demands.  Specifically, Mark Begor (President and CEO, GE Capital Real Estate and President and CEO, GE Capital Restructuring Operations), the executive responsible at the time for managing GE Capital's and WMC's handling of loan repurchase demands, publicly boasted to investors on a conference call that "[i]f you've seen some of our results you know that we refute every loan."  GE Capital Investor Webcast, December 7, 2010.

84.     The sixty-day period prescribed under Section 2.03(f) of the PSA has expired and WMC has not cured or repurchased any of the Mortgage Loans identified in the Trustee's Repurchase Demand Letters.

85.     WMC's breach of its Repurchase Obligation is grossly negligent given that WMC had ample notice of pervasive problems with the Mortgage Loans.  Upon information and belief,

discovery will show still further evidence of WMC's gross negligence regarding its failure to repurchase loans in breach of its representations and warranties.

        **C.**      **<u>WMC Breaches its Indemnification Obligation</u>**

        86.      The Trustee, Trust, and its investors have incurred legal fees, costs, and expenses resulting from WMC's breaches of the WMC Representations and Warranties and its breach of its Repurchase and Indemnification Obligations.  The Trustee expects such expenses to continue to accrue for so long as WMC remains in breach of its obligations.   Accordingly, the Indemnification Obligation has both matured and continues to accrue with respect to existing and future claims.

        87.      WMC has refused to indemnify the Trustee or the Trust for expenses resulting from WMC's breaches of the WMC Representations and Warranties and its breach of its Repurchase Obligation.

**<u>CLAIMS FOR RELIEF</u>**

**<u>Count I</u>**
**(Breach of Contract – Breach of WMC's Representations and Warranties)**

        88.      Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

        89.      The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

        90.      As part of the PSA, WMC made numerous WMC Representations and Warranties regarding the Mortgage Loans.  These WMC Representations and Warranties were made by WMC for the benefit, *inter alia*, of the Trustee.

        91.      WMC has breached the WMC Representations and Warranties.

92.     WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders.

93.     Pursuant to the Repurchase Demand Letters, WMC was given notice of pervasive breaches in the Mortgage Loans, including, but not limited to, the loans specifically identified in the Repurchase Demand Letters.  Upon information and belief, WMC also discovered pervasive breaches in the Mortgage Loans.

94.     The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.  Alternatively, any obligation of the Trustee has been excused and rendered futile by WMC's conduct.

95.     As a direct and proximate cause of WMC's breaches of the WMC Representations and Warranties, the Trust, the Trustee, and Certificateholders have suffered and continue to suffer significant damages.  Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by breaching its representations and warranties.

96.     Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $650 million.

97.     Plaintiff is also entitled to an order of specific performance requiring WMC to repurchase all loans in the Trust in material breach of WMC's representations and warranties, including, but not limited to, the loans described in the Repurchase Demand Letters.  The Trustee reserves the right to seek repurchase of additional Mortgage Loans (and to introduce evidence of additional breaches affecting previously-noticed Mortgage Loans) based on discovery,

investigation, and further forensic analysis and re-underwriting of loan files for other Mortgage Loans held in the Trust.

98.     The Trust is also entitled to rescission or rescissory damages.  Rescission is warranted because WMC is in willful and material breach of the PSA, as shown by its failure to repurchase any Mortgage Loans after explicit notice from the Trustee, and because, upon information and belief, WMC was aware before the Repurchase Demand Letters that numerous Mortgage Loans were in breach.  WMC's breaches are so widespread as to defeat the purpose of the contract.  Allowing WMC to escape its contractual repurchase obligations at the Trust's expense would be inequitable.  To the extent rescission is impractical, or would not achieve the PSA's essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

## Count II
### (Breach of Contract – Breach of WMC's Obligation to Notify)

99.     Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

100.     The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

101.     WMC, in its capacity as Originator under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.

102.     Under Section 2.03(e) of the PSA, WMC, as Originator, was required to give prompt written notice to the Trustee upon discovery of a breach of any of these representations and warranties.

27

103.    Upon information and belief, WMC discovered that the Mortgage Loans breached WMC's representations and warranties, but failed to give prompt written notice of any breaches to the Trustee.  WMC thereby breached its obligations to the Trustee under the PSA.

104.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders.

105.    The Trustee has performed the obligations under the PSA required to bring suit and has not excused the performance by WMC of any of its obligations under the PSA.  The Trustee has substantially complied with any applicable notice requirements.  Compliance has also been excused and rendered futile by WMC's actions.

106.    The Trust, the Trustee, and Certificateholders have been damaged by WMC's failure to provide prompt written notice of breaches of WMC's representations and warranties. Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by breaching its representations and warranties.

107.    Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $650 million.

108.    Plaintiff is also entitled to an order of specific performance requiring WMC to repurchase all loans in the Trust in material breach of WMC's representations and warranties, including, but not limited to, the loans described in the Repurchase Demand Letters.  The Trustee reserves the right to seek repurchase of additional Mortgage Loans (and to introduce evidence of additional breaches affecting previously-noticed Mortgage Loans) based on discovery, investigation, and further forensic analysis and re-underwriting of loan files for other Mortgage Loans held in the Trust.

109.    The Trust is also entitled to rescission or rescissory damages.  Rescission is warranted because WMC is in willful and material breach of the PSA, as shown by its failure to repurchase any Mortgage Loans after explicit notice from the Trustee, and because, upon information and belief, WMC was aware before the Repurchase Demand Letters that numerous Mortgage Loans were in breach.  WMC's breaches are so widespread as to defeat the purpose of the contract.  Allowing WMC to escape its contractual repurchase obligations at the Trust's expense would be inequitable.  To the extent rescission is impractical, or would not achieve the PSA's essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

**Count III**
**(Breach of Contract – Breach of WMC's Repurchase Obligations)**

110.    Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

111.    The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

112.    WMC, in its capacity as Originator under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.

113.    WMC has breached the WMC Representations and Warranties.

114.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders.

115.    WMC has breached its Repurchase Obligation by failing to cure the breaches of the WMC Representations and Warranties identified in the Repurchase Demand Letters in all material respects or repurchase the Mortgage Loans at the specified Repurchase Price.

116.    The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.

117.    As a direct and proximate cause of WMC's breach of its Repurchase Obligation, the Trust, the Trustee, and Certificateholders have suffered and continue to suffer significant damages.  Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by breaching its representations and warranties.

118.    Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $650 million.

119.    Plaintiff is also entitled to an order of specific performance requiring WMC to repurchase all loans in the Trust in material breach of WMC's representations and warranties, including, but not limited to, the loans described in the Repurchase Demand Letters.  The Trustee reserves the right to seek repurchase of additional Mortgage Loans (and to introduce evidence of additional breaches affecting previously-noticed Mortgage Loans) based on discovery, investigation, and further forensic analysis and re-underwriting of loan files for other Mortgage Loans held in the Trust.

120.    The Trust is also entitled to rescission or rescissory damages.  Rescission is warranted because WMC is in willful and material breach of the PSA, as shown by its failure to repurchase any Mortgage Loans after explicit notice from the Trustee, and because, upon information and belief, WMC was aware before the Repurchase Demand Letters that numerous Mortgage Loans were in breach.  WMC's breaches are so widespread as to defeat the purpose of the contract.  Allowing WMC to escape its contractual repurchase obligations at the Trust's expense would be inequitable.  To the extent rescission is impractical, or would not achieve the

PSA's essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

## Count IV
### (Breach of Contract – Breach of WMC's Duty to Indemnify)

121.    Plaintiff incorporates by reference all prior paragraphs as if they were fully set forth herein.

122.    The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

123.    WMC, in its capacity as Originator under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.

124.    WMC has breached the WMC Representations and Warranties.

125.    WMC has breached its Indemnification Obligation by failing to indemnify the Trustee and the Trust for the costs and expenses, including the cost of loan reviews and legal costs, resulting from WMC's breaches of the WMC Representations and Warranties.

126.    The Trustee has performed all of its obligations under the PSA and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.

127.    As a direct and proximate cause of WMC's breaches of its Indemnification Obligation, the Trust, the Trustee, and Certificateholders have suffered and continue to suffer significant damages.

128.    WMC is liable for breach of its Indemnification Obligation.

## PRAYER FOR RELIEF

WHEREFORE, the Trust, acting through the Trustee, respectfully requests that the Court enter judgment in its favor and against WMC as follows:

(1)     Declare that WMC has breached its representations and warranties, its notice obligations, and its cure, repurchase, and indemnification obligations with respect to each Mortgage Loan in material breach of a WMC representation or warranty (a "Defective Mortgage Loan"), including, but not limited to, each of the Defective Mortgage Loans specifically identified in the Repurchase Demand Letters;

(2)     Declare that WMC's duty to cure or repurchase Defective Mortgage Loans survives even where Defective Mortgage Loans have been liquidated;

(3)      Enter an order of specific performance requiring WMC to repurchase all Defective Mortgage Loans including, but not limited to, each of the Defective Mortgage Loans specifically identified in the Repurchase Demand Letters, at the contractually defined Repurchase Price;

(4)     Award damages against WMC in an amount to be proven at trial, but in no event less than $650 million;

(5)     Award indemnification for costs and expenses incurred by the Trust and the Trustee as a result of the claims and demands resulting from WMC's breaches, including attorneys' fees and costs;

(6)     Award rescissory damages against WMC in an amount to be proven at trial;

(7)     Award attorneys' fees, costs, and other related expenses;

(8)     Award pre-judgment and post-judgment interest; and

32

(9)     Award such further relief as this Court deems just and proper.


                                    PLAINTIFF DEUTSCHE BANK NATIONAL
                                    TRUST COMPANY, SOLELY AS TRUSTEE
                                    FOR MORGAN STANLEY ABS CAPITAL I INC.
                                    TRUST 2006-WMC2

                                    Respectfully submitted,

                                    /s/ Thomas D. Goldberg
Steven F. Molo                      Thomas D. Goldberg (ct04386)
MOLO LAMKEN LLP                     Kathryn G. Newman (ct28708)
540 Madison Ave.                    DAY PITNEY LLP
New York, New York 10022            One Canterbury Green
Tel: (212) 607-8160                 Stamford, Connecticut 06901
Fax: (212) 607-8161                 Tel: (203) 977-7300
Email: smolo@mololamken.com         Fax: (203) 977-7301
                                    Email: tgoldberg@daypitney.com
                                    Email: knewman@daypitney.com
Robert K. Kry
Justin V. Shur
Martin V. Totaro
MOLO LAMKEN LLP
600 New Hampshire Ave. N.W.
Suite 660
Washington, D.C. 20037
Email: rkry@mololamken.com
Email: jshur@mololamken.com
Email: mtotaro@mololamken.com